ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2022-Apr-26  11:25:19
60CV-22-2662
C06D17 : 58 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS

| | |
|---|---|
| JESSICA BAKER | Case No. 60CV-22-_____ |
|             Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| IMANGI STUDIOS | **DEMAND FOR JURY TRIAL** |
|             Defendant. | |

**TABLE OF CONTENTS**                                    **Page**

I.      INTRODUCTION ............................................................................................1

II.     PARTIES ........................................................................................................5

III.    JURISDICTION AND VENUE ....................................................................5

IV.     ALLEGATIONS APPLICABLE TO ALL COUNTS ..................................6

        A.      The Temple Run Apps are designed for and marketed to a child audience. ..........6

        B.      Defendant hides "SDK" code in the Temple Run Apps that secretly
                monitors, tracks, and profiles children................................................14

        C.      Imangi Contracts with Numerous SDKs to Exfiltrate Children's Personal
                Data for the Purpose of Commercial Exploitation..................................22

        D.      Imangi Misleadingly and Deceptively States That it Does Not Collect
                Personal Data from Children Who Play Temple Run Gaming Apps. ................26

        E.      Imangi's Privacy-Invasive, Surreptitious Conduct Harms Children and
                Egregiously Violates Entrenched Social Norms......................................32

        F.      Imangi's Practice of Secretly Tracking and Profiling Children Via Their
                Personal Data Violates Longstanding, Deeply Held Societal Norms That
                Value and Protect Individuals' Privacy In General and Children's Privacy
                In Particular................................................................................36

        G.      Defendant's Omissions and Misrepresentations Create the False
                Impression That Temple Run is Compliant with Privacy Laws and Social
                Norms......................................................................................48

V.      NAMED PLAINTIFF ALLEGATIONS ........................................................49

VI.     CLASS ALLEGATIONS ..............................................................................49

VII.    TOLLING ......................................................................................................51

        A.      Discovery Rule Tolling...............................................................51

        B.      Fraudulent Concealment Tolling..................................................52

        C.      Estoppel....................................................................................52

VIII.   CLAIMS FOR RELIEF .................................................................................52

IX.     PRAYER FOR RELIEF .................................................................................54

        DEMAND FOR JURY TRIAL .......................................................................56

## I.    INTRODUCTION

1.    This action is brought to protect children in the State of Arkansas from Defendant's surreptitious collection and dissemination of their Personal Data for the purposes of tracking children over time and across the internet and targeting them for psychological and commercial exploitation.

2.    Defendant Imangi Studios ("Imangi") develops and publishes the popular franchise of Temple Run apps. First introduced in 2011, the apps became immensely popular with children, with their simplistic gameplay in which the player controls an explorer who's obtained an ancient artifact and who is now being pursued by monkeys trying to regain the artifact.



*Fig. 1*

3.    The Temple Run franchise extends to more than simply apps. Imangi markets physical Temple Run products to children as well, capitalizing on its apps' success. These products include, *inter alia*, plush toys, books, games, kids' pajama sets, and even fast-food kids' meal tie ins.

1

4.      Imangi's forerunner to Temple Run was an app called Max Adventure. The game play and general setup was identical, but the protagonist was a child. This app inspired the creation of Temple Run.[1]

5.      The apps in the Temple Run franchise consist of at least the following: Temple Run and Temple Run 2, Temple Run Brave[2], and Temple Run Oz[3] (collectively, "Temple Run Apps" or "Apps").

6.      Imangi directs the Temple Run Apps to young children. As Imangi CEO Walter Devins states, "parents view Temple Run as a family friendly game, something they believe in and feel comfortable letting their kids play."[4]

7.      The Apps are so popular with children, in fact, that Temple Run won a "Kids' Choice Award" for "Favorite App" on the child-oriented media network Nickelodeon.[5] Temple Run beat out other blockbuster children's franchises such as Minecraft, Angry Birds, and Fruit Ninja.[6] This award is prominently displayed in Imangi's headquarters,[7] and Imangi urged its supporters to vote for Temple Run in the following year's competition, as well:

---

[1] VentureBeat, *Even with a Temple Run empire, Imangi Studios wants to stay indie at heart*, https://venturebeat.com/2014/06/04/even-with-a-temple-run-empire-imangi-studios-wants-to-stay-indie-at-heart-interview/ (accessed April 5, 2022).
[2] Defendant's then-CEO, Keith Shepherd, explained in an interview that he saw Temple Run having extensive parallels with Brave, an animated movie with a comparable child audience: "When we saw the trailer for Brave, we thought it looked like a great movie — I've always been a huge fan of everything that Pixar does – but there were so many parallels to Temple Run, too, in terms of the spirit and the environments, that would lend themselves very well to a game." *Id.*
[3] In the same interview, Shepherd went on to say "I felt like the universe of Brave and the universe of Oz lent themselves to the gameplay and the kind of spirit of our game." *Id.*
[4] Brendan Sinclair, "Temple Running the Gamut of Brand Extensions," Gameindustry.biz (Nov. 2, 2021) (available at https://www.gamesindustry.biz/articles/2021-11-02-temple-running-the-gamut-of-brand-extensions) (accessed April 5, 2022).
[5] Sierra McCleary-Harris, "Temple Run Wins Nickelodeon Kids' Choice Award, Unveils New Licensing Partnerships," Toybook (April 1, 2013) (available at https://toybook.com/temple-run-wins-nickelodeon-kids-choice-award-unveils-new-licensing-partnerships/) (accessed April 5, 2022).
[6] *Id.*
[7] Laura Brummett, "Hit Game Temple Run Helps Imangi Studios Keep Pace With Bigger Rivals," GrepBeat (Feb. 1, 2020) (available at https://grepbeat.com/2020/02/18/hit-game-temple-run-helps-imangi-studios-keep-pace-with-bigger-rivals/) (accessed April 5, 2022).

 **Temple Run**
@TempleRun                                                                        ...

Temple Run has been nominated for a Kids Choice
Award for "Best App" Vote for us here! nick.com/kids-
choice-aw...



2:06 PM · Mar 26, 2014 · Twitter Web Client

*Fig. 2*

8.      Defendant monetizes the Temple Run Apps in a host of ways. For example, Imangi
sells paid apps for download; sells "virtual goods" (*e.g.* tools and features to prolong or enhance
play) within the apps; and, as noted above, sells physical toys and merchandise.

9.      But most critically, Imangi hides invisible software code in its Apps, which secretly
monitors children as they play the games. In so doing, the Temple Run Apps collect uniquely
identifying digital data points associated with the children and their mobile devices. This device-
and even location-based "Personal Data"[8] is then transmitted to numerous—indeed, uncountable
and unknowable numbers of—third-party advertising networks and marketing entities.

---

[8] As used herein, "Personal Data" means individually identifiable information about an

3

10.    Imangi does this without parental knowledge or consent, exfiltrating children's Personal Data in order to profile and target the children with advertisements, not just within the Temple Run Apps but also in perpetuity, for any purpose that an anonymous bidder is willing to pay for.

11.    Forensic evidence reveals that Defendant and its third-party ad-tech partners ("Advertising Partners")[9] relentlessly, repeatedly, and intentionally harvested children's Personal Data for psychological and commercial exploitation for over a decade.

12.    This conduct endangers the children of Arkansas, undermines the ability of parents to protect their children's privacy, and violates state law.

13.    Defendant's tracking and profiling of Arkansas children violates the common-law tort of intrusion upon seclusion. The surreptitious and intentional monitoring, tracking, and profiling of children—in direct violation not only of the law but of longstanding societal norms—is egregious conduct.

14.    Plaintiff brings a claim under the Arkansas law of Intrusion Upon Seclusion on behalf of herself and a class of parents from Arkansas. Plaintiff seeks an injunction to stop Defendant's unlawful practices and sequester its unlawfully obtained Personal Data, and an award of nominal damages.

---

individual collected online, including: (1) A first and last name; (2) A home or other physical address including street name and name of a city or town; (3) Online contact information; (4) A screen or user name where it functions in the same manner as online contact information; (5) A telephone number; (6) A Social Security number; (7) A persistent identifier that can be used to recognize a user over time and across different Web sites or online services. Such persistent identifiers include, but are not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier; (8) A photograph, video, or audio file where such file contains a child's image or voice; (9) Geolocation information sufficient to identify street name and name of a city or town; or (10) Information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition. A further explanation of device-specific, personally-identifiable Personal Data that Defendant and its partners collect is detailed *infra*.
[9] As set forth more fully *infra*, Defendant's Advertising Partners include, but are not limited to, the following: AdColony, AdMob (Google's advertising SDK), Applovin, Chartboost, Facebook, Inmobi, ironSource, Smaato, TapJoy, Unity, and Vungle.

## II.    PARTIES

### Plaintiff

15.     Plaintiff Jessica Baker is the parent of children who played the online gaming application or app Temple Run ("Temple Run" or the "App"), which is operated by the Defendant.

16.     Plaintiff Jessica Baker, and her minor children, "KCC," "BAB," and "LAB" reside in Pulaski County, Arkansas.  Ms. Baker brings this action on behalf of herself, KCC, BAB, and LAB, and all others similarly situated.  KCC, BAB, and LAB are minors, and each played Temple Run on a mobile device.

### Defendant

17.     Defendant Imangi Studios (the "Defendant" or "Imangi") is a commercial mobile game development company headquartered at 4601 Six Forks Rd., Suite 121, Raleigh, NC 27609. Imangi is responsible for developing Temple Run, publishing it for user download in the Apple App Store and Google Play Store, and marketing it. This includes working with advertisers, contracting with ad networks (as defined *infra*), embedding advertisers' software into Temple Run, and integrating social media platforms into Temple Run.

## III.    JURISDICTION AND VENUE

18.     Substantial acts giving rise to the causes of action asserted herein occurred in this State and within this venue.

19.     Jurisdiction is proper in this Court because proposed class representative, Jessica Baker, resides in Pulaski County, Arkansas, and numerous proposed class members are citizens of Arkansas.

20.     This Court has personal jurisdiction over Defendant because it purposefully directs its conduct at Arkansas, transacts business in Arkansas, has substantial aggregate contacts with Arkansas, engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in Arkansas, and purposely availed itself of the laws of Arkansas.

5

21.    The Defendant's activities in Arkansas gave rise to and furthered the privacy violations suffered by Plaintiff and her children.  Defendant worked in concert with each of the Advertising Partners to exfiltrate the Personal Data of child app users in Arkansas—as children played the Temple Run Apps in Arkansas—and to send that data to the Advertising Partners where it could be analyzed and monetized for financial gain, in violation of Plaintiff's and Class members' privacy expectations.

22.    Additionally, Defendant manufactured and directed the sale of merchandise and entertainment in Arkansas, for the purpose of promoting and profiting from its Temple Run Apps. Items such as, *inter alia*, toys, games, books, fast-food prizes, and comics have been sold or offered for sale in Arkansas, in connection with the Temple Run Apps and the conduct complained of herein.

23.    Plaintiff and her children were harmed by Defendant's activity in Arkansas.

24.    In accordance with Ark. Code Ann. § 16-60-101, venue is proper in this Circuit because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this Circuit, and Defendant transacts business in this Circuit.

IV.    **ALLEGATIONS APPLICABLE TO ALL COUNTS**

A.    **The Temple Run Apps are designed for and marketed to a child audience.**

25.    The Temple Run Apps are or have been available for download in online app stores, including the Apple App Store ("Apple Store") and the Google Play Store ("Google Play"), throughout the Relevant Period.[10]

26.    In 2011 Imangi released its first Temple Run App—the original "Temple Run" game—which subsequently became a franchise that includes Temple Run, Temple Run 2, Temple Run Brave and Temple Run Oz.

_____

[10] As set used herein, the Relevant Period extends from August 4, 2011 through the present.

27.    Imangi represents that each of the Temple Run Apps is for child audiences, indicating a "9+" rating on the Apple Store and an "Everyone" rating in Google Play.  These ratings indicate the intended audience for a given app.

28.    For example, Google Play ratings "are intended to help consumers, especially parents, identify potentially objectionable content that exists within an app" and are based on the app developer's responses to questionnaires provided by Google—*i.e.* the ratings reflect the *developer's* representations about the appropriate audience for the app.[11]

29.    An "Everyone" rating means the app's content is "generally suitable for all ages" and "[m]ay contain minimal cartoon, fantasy or mild violence and/or infrequent use of mild language."[12]

30.    Google created guidance for developers that adopts a comparable rubric. In a blog post titled "Building a safer Google Play for kids,"[13] it uses illustration of sample apps that might appeal to children, children & adults, or simply adults:

---

[11]    "Play Console Help," Google   https://support.google.com/googleplay/android-developer/answer/188189?hl=en (accessed April 5, 2022).
[12] *Id.*
[13]    Google, , *Building a safer Google Play for kids* https://android-developers.googleblog.com/2019/05/building-safer-google-play-for-kids.html (accessed April 5, 2022).



*Fig. 3*

31. Similarly, Google offers its own content-based rubric that identifies whether an app is child-directed ("Manage target audience and app content settings"[14]), including whether apps:

- Support non-readers, or early readers, with limited reliance on text

- Have a simple design with large iconography and clear, consistent interactive elements

- Center on pretend play, and simple problem solving, and/or creative free play

- Are positive in tone or silly, and have a happy ending or clear takeaway

- Contain funny and/or popular characters or stories, even slapstick humor and hyperbole

- Utilize badges, collecting characters, unlocking levels, or other age-appropriate incentives

- Relate to early education, like language development, early literacy, and basic math

---

[14]     Google, *Play Console Help*, https://support.google.com/googleplay/android-developer/answer/9867159?visit_id=637522057853722464-2168424342&rd=1#age-groups&zippy=%2Cage-and-under%2Cages-- (accessed April 5, 2022).

8

- Require logic or spatial problem solving, but not necessarily deductive reasoning and abstract thinking (which may still be too hard)

32.    As demonstrated by the images below, the Temple Run Apps contain coins, animals, large font directions, simple moves, characters, and more.



*Fig. 4*



*Fig. 5*

33.    Imangi acknowledges that its Temple Run Apps are child-directed through an interview done with CEO, Walter Devins. He explains "[P]arents view Temple Run as a family friendly game, something they believe in and feel comfortable letting their kids play."[15]

---

[15]    GamesIndustry, Temple Running the Gamut of Brand Extensions, https://www.gamesindustry.biz/articles/2021-11-02-temple-running-the-gamut-of-brand-extensions (accessed April 5, 2022).

34.    Further, Devins explicitly credits the Apps' popularity with its child audience: "A lot of the other games do marketing campaigns, advertisements online. Ours was word of mouth. Ours was kids in high school or elementary school or middle school saying 'hey did you play what's your high score.' It really grew that way. It's phenomenal."[16]

35.    As early as 2012, Imangi focused on getting children to buy virtual goods (*e.g.*, goods sold and used while playing games, like Powerups) and actual physical goods like Temple Run board games, comic books, plush toys, and collectible characters.

36.    Examples of the merchandise based on the cartoonish, child-directed Temple Run games that Imangi markets to children include child-directed toys, games, books, pajamas, and fast-food kids' meal prizes.



*Fig. 6*

---

[16] Evan Sery, "Raleigh's Imangi Studios celebrates 10th anniversary of 'Temple Run'" (Aug. 4, 2021) (available at https://www.baynews9.com/fl/tampa/news/2021/08/04/-temple-run--celebrates-milestone) (accessed April 5, 2022).



*Fig. 7*



*Fig. 8*



*Fig. 9*



*Fig. 10*



*Fig. 11*



*Fig. 12*

37.     Imangi has a host of licensing arrangements for child-directed products,[17] as evidenced by the above, and is well aware the cartoonish characters in its Temple Run franchise are being used to capitalize on the Apps' huge popularity with their child audiences.  In each instance, Imangi approves of the product and the content, and each licensee must agree to relevant audits performed by Imangi.

38.     Imangi also merchandises to – and monetizes – children with "in-app" purchases that allow them to buy in-game goods or services while playing the Temple Run Apps. Prices for these in-app purchases range from $1.99 to $49.99.

39.     It is beyond dispute that Imangi knows that a sizeable portion of the audience for the Temple Run Apps is children. Yet Defendant harvests children's Personal Data from the child-directed Apps in connection with: (i) children's purchase of the Apps; (ii) children's purchase of virtual goods within those Apps that enhance play and promote continued play; and (iii) children's play of the Temple Run Apps themselves, which is encouraged by the marketing of related merchandise.

**B.      Defendant hides "SDK" code in the Temple Run Apps that secretly monitors, tracks, and profiles children.**

40.     Unbeknownst to parents and their children, Imangi installed software code within the Temple Run Apps for the single and distinct purpose of tracking kids on- and off the games, in order to profile them and serve them targeted advertising.

41.     Specifically, Imangi embeds "software development kits" or "SDKs," which are free-standing units of code that developers can insert into their apps to perform certain functions. Some SDKs are used to handle tasks like in-app billing, while others might be used for rendering animation or playing video.  In this way, app developers are like vehicle manufacturers, which also incorporate third-party components like brake pads or airbags into their vehicles, rather than building those components on their own, from scratch.

---

[17] Imangi's licensing partner is Dimensional Branding Group, which specializes in licensing agreements for developers of child-directed apps.  https://dimensionalbranding.com/our-brands/ (accessed April 5, 2022).

42.     But not all SDKs are used for benign purposes. Third-party advertising companies have created their own SDKs that operate secretly, behind-the-scenes, and collect app user's Personal Data and track online behavior to facilitate targeted advertising and profiling.

43.     In the case of these advertising SDKs, an app developer (like Imangi) embeds the SDK code into the underlying code of the app itself. The SDK then tracks the apps' users, profiles them, and serves them targeted ads. Then, the company that owns the SDK pays the app developer for each ad shown within the app.

44.     This practice is a substantial source of revenue for many app developers, including Imangi, and enables developers to offer the apps for "free." But as the saying goes: if you're not paying for the product, then you *are* the product. Instead of paying money for a game, the user ends up "buying" the game by continually being tracked and profiled by a near-limitless amount of third-party ad tech companies.

45.     Here, the children playing the Temple Run Apps are the product. And as they play the games, the advertising SDKs collect their Personal Data without the child's or parent's knowledge or consent.  This Personal Data is then exfiltrated to sophisticated advertising companies where it is used to track and profile the children.

### 1.    Advertising SDKs use "Persistent Identifiers" to Track Children in the Temple Run Apps.

46.     As soon as a child opens up a Temple Run Gaming App on her device, the app will connect to servers used by the advertising SDK and other advertising companies and begin sending those servers data. This activity is invisible to the child (and her parent), who simply sees the given app's game interface.

47.     As the child plays the Temple Run Gaming App, the embedded SDK continues to communicate with its own and other advertising companies' respective servers, sending requests for an ad—or "calls"—to those servers. With each call, the SDK also sends the child's Personal Data.

48.     The most common data Defendant and its SDK partners take from users' devices for tracking, profiling, and targeting are called "**persistent identifiers**." Each mobile device—like a phone or a tablet—has a host of different data points that are uniquely associated with that particular device. Just like a car's license plate number or VIN will identify that specific vehicle, a device's persistent identifiers are unique to that device, and in just the same way that one could identify someone via his car's license plate, advertisers and data profilers use devices' persistent identifiers to monitor the device's owner and tie things like browsing history, app usage, and even geolocation back to that individual.

49.     The common persistent identifiers for Apple are the ID for Advertisers ("IDFA") and ID for Vendors ("IDFV"). Both the IDFA and the IDFV are unique, alphanumeric strings that are used to identify an individual device—and the individual who uses that device—in order to track and profile the user, and to serve her with targeted advertising.

50.     The common persistent identifiers in the Android operating system are the Android Advertising ID ("AAID") and the Android ID.  The AAID and Android ID are unique, alphanumeric strings assigned to a user's device and used by apps and third parties to track and profile the user, and to serve her targeted advertising.

51.     A device's International Mobile Equipment Identity ("IMEI") is also a persistent identifier. An IMEI is a fixed, unique 15-digit serial number that is used to route calls to one's phone and reflects information about the origin, model, and serial number of the device. A device has one fixed IMEI.

52.     Additionally, each Apple and Android device can be identified by its "Device Fingerprint" data, which is another form of persistent identifier. Device Fingerprint data include a myriad of individual pieces of data about a specific device, including details about its hardware—such as the device's brand (*e.g.*, Apple or Android), the type of device (*e.g.*, iPhone, Galaxy, iPad)—and details about its software, such as its operation system (*e.g.*, iOS or Android). This data can also include more detailed information, such as the network carriers (*e.g.*, Sprint, T-Mobile, AT&T), whether it is connected to Wi-Fi, and the "name" of the device. The name of the

device is often particularly personal, as the default device name is frequently configured to include users' first and/or last names (*e.g.*, "Jane Minor's iPhone"). In combination, the pieces of data comprising the Device Fingerprint provide a level of detail about the given device that allows that device and its user to be identified individually, uniquely, and persistently—as the appellation "Fingerprint" implies.

      53. In the course of making a single call to an advertising SDK's server, a host of different items of Personal Data are siphoned from the Temple Run Apps and sent to third parties. An illustrative chart of the types of data that might be sent—and their significance—is as follows:

| Data Point | Exemplar Data Field[18] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | B3626A74-54CZ-314C-C825-C2A87669D561 | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | 6Y9FDE20-8F6A-8401-93A3-F4877623A930 | Jane Minor's device's unique IDFV |
| AAID (Android users) | A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2 | Jane Minor's device's unique AAID |
| Android ID (Android users) | 28507917b736aa32 | Jane Minor's device's unique Android ID |
| IMEI (Android users) | 648760896327625 | Jane Minor's device's unique IMEI |
| User's device name | personal_device_name: "Jane Minor's iPhone" | Jane Minor owns this iPhone |
| User's device's IP address | 216.3.128.12 | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |
| User's language | Accept-Language: en-US, en-us | Jane Minor's Temple Run app is in American English |
| User's mobile network | carrier_name: T-Mobile | Jane Minor's service provider is T-Mobile |
| User's time zone | timezone: America/Los_Angeles | Jane Minor is playing temple Run while in the Pacific time zone |
| Manufacturer, make, and model of the user's device | • device_name: iPhone 6,1 • device_type: iPhone | Jane Minor is playing Subway Surfers on her Apple iPhone 6 |

[18] The figures in this table are merely exemplars and, to protect Plaintiff's privacy, do not disclose any individual's Personal Data. Except where indicated otherwise, data points are derived from an Apple device.

| User's device operating system and version | • platform: iOS<br>• os_version: 10.3.2 | Jane Minor's phone is running Apple's iOS 10.3.2. |
|---|---|---|
| User's Internet connection | connection_type: wifi | Jane Minor's device is connected to wireless Internet |
| User's country | country_code: us | Jane Minor is playing her Temple Run App in the US |
| Timestamp | timestamp: 1527608937 | The SDK in Jane Minor's Temple Run App made a request to the SDK's servers on May 29, 2018 at 15:48:57[19] UTC.[20] |
| Screen dimensions of the user's device | • display_h: 1136<br>• display_d: 326<br>• display_w: 640 | Jane Minor's device screen is 1136 in height, 640 in width, and 326 in density |

*Fig. 13*

54.     Defendant and its Advertising Partners exfiltrate and analyze persistent identifiers—including a user's IDFA/IDFV (for Apple devices), Android ID/AAID (for Android devices), or Device Fingerprint data[21]—in order to learn more about users, including their behaviors, demographics, and preferences, and, thereafter, to serve them with tailored and targeted advertising.

## 2.     The use of Personal Data in Profiling and Targeting Children

55.     As discussed above, a persistent identifier is unique to a specific device, like the license plate or VIN of a car, or a social security number for an individual. When an ad tech company gets a user's persistent identifier, they can tie any activity associated with that persistent identifier back to a given device and, by extension, back to a given individual.

---

[19] The timestamp is formatted to track the number of seconds since Jan. 1, 1970. By using a decoder, such as http://coderstoolbox.net/unixtimestamp, the timestamp can be converted to an exact date and time.

[20] Coordinated Universal Time.

[21] There are multiple, additional items of data that are universally recognized as persistent identifiers. For example, a device's Wi-Fi MAC address is a fixed serial number that is used to identify one's phone when transmitting and receiving data using Wi-Fi. Plaintiff's forensic analysis has principally focused on the exfiltration and use of IDFA/IDFV, Android ID/AAID, and Device Fingerprint data persistent identifiers. However, as alleged herein, Advertising Partners acknowledge collecting *additional* persistent identifiers.

56.    Viewed in isolation, a persistent identifier is merely a string of numbers uniquely identifying a user, but when linked to other data points about the same user, such as app usage, geographic location (including likely domicile), and Internet navigation, it discloses a personal profile that can be exploited in a commercial context.  One knows the owner of Smart Phone A plays Game B, regularly visits Websites C, D, and E, lives in Country G, State H, and City I, etc. Over a short period of time, an incredibly revealing profile of the individual emerges:



*Fig. 14*[22]

57.    The Federal Trade Commission (the "FTC") provides an illustration of persistent identifiers being used to amass a data profile, via an SDK embedded within an app.  In its 2012 report entitled "Mobile Apps for Kids: Disclosures Still Not Making the Grade," (the "FTC Mobile Apps for Kids Report") addressing privacy dangers for children in the app space, the FTC cited forensic analysis in which:

> [O]ne ad network received information from 31 different apps.
> Two of these apps transmitted geolocation to the ad network along
> with a device identifier, and the other 29 apps *transmitted other
> data (such as app name, device configuration details, and the time
> and duration of use) in conjunction with a device ID. The ad
> network could thus link the geolocation information obtained
> through the two apps to all the other data collected through the

---

[22]    https://postoplan.app/blog/what-is-the-best-social-media-targeted-advertising-strategy-for-2021 (accessed April 5, 2022).

*other 29 apps by matching the unique, persistent device ID.*[23]

58.     The FTC expressed particular "[c]oncerns about creations of detailed profiles based on device IDs [such as those amassed by Defendant]…where…companies (like ad networks and analytics providers) collect IDs and other user information through a vast network of mobile apps. This practice can allow information gleaned about a user through one app to be linked to information gleaned about the same user through other apps."[24]

59.     Defendant and its Advertising Partners traffic in the same data identified by the FTC (persistent identifiers such as IDFA/AAID and Device Fingerprint data) causing the same harm identified by the FTC: allowing ad networks to combine data points about child users from a multitude of apps.

60.     The FTC Mobile Apps for Kids Report cautions that it is standard practice—and long has been standard practice—for ad networks, mobile advertisers, and ad middlemen (including, for example, Defendant and their partners and agents) to link the persistent identifiers they acquire with *additional* Personal Data—such as name, address, email address—allowing those entities and their partners to identify individual users whom they profile with indisputable, individual specificity.[25]

---

[23] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade," FTC Staff Report (Dec. 2012), at 10 n. 25 (emphasis added) (citing David Norris, Cracking the Cookie Conundrum with Device ID, AdMonsters (Feb. 14, 2012), *available at* http://www.admonsters.com/blog/cracking-cookie-conundrum-device-id (accessed April 5, 2022) ("Device ID technology is the ideal solution to the problem of remembering what a user has seen and what actions he or she has taken: over time, between devices and across domains. . . . *Device ID can also help businesses understand visitor behavior across devices belonging to the same person or the same residence.*") (emphasis added).

[24] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade." FTC Staff Report (Dec. 2012), at 9.

[25] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade." FTC Staff Report (Dec. 2012), at 10 n. 25 (citing Jennifer Valentino-DeVries, *Privacy Risk Found on Cellphone Games, Digits Blog,* Wall St. J. (Sept. 19, 2011), *available at* http://blogs.wsj.com/digits/2011/09/19/privacy-risk-found-on-cellphone-games/ (accessed April 5, 2022) (noting how app developers and mobile ad networks often use device IDs to keep track of user accounts and store them along with more sensitive information like name, location, e-mail address or social-networking data)).

61.    Indeed, key digital privacy and consumer groups have described why and how a persistent identifier alone facilitates targeted advertising and renders meaningless any claims of "anonymized" identifiers:

> With the increasing use of new tracking and targeting techniques, any meaningful distinctions between personal and so-called non-personal information have disappeared. This is particularly the case with the proliferation of personal digital devices such as smart phones and Internet-enabled game consoles, which are increasingly associated with individual users, rather than families. This means that marketers do not need to know the name, address, or email of a user in order to identify, target and contact that particular user.[26]

62.    A 2014 report by the Senate Committee on Homeland Security and Governmental Affairs entitled "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy" amplifies this concern in light of the growth of third-party trackers that operate behind the scenes in routine online traffic:

> Although consumers are becoming increasingly vigilant about safeguarding the information they share on the Internet, many are less informed about the plethora of information created about them by online companies as they travel the Internet. *A consumer may be aware, for example, that a search engine provider may use the search terms the consumer enters in order to select an advertisement targeted to her interests. Consumers are less aware, however, of the true scale of the data being collected about their online activity.* A visit to an online news site may trigger interactions with hundreds of other parties that may be collecting information on the consumer as she travels the web. The Subcommittee found, *for example, a trip to a popular tabloid news website triggered a user interaction with some 352 other web servers as well. ... The sheer volume of such activity makes it difficult for even the most vigilant consumer to control the data being collected or protect against its malicious use.*[27]

63.    In the course of disclosing Personal Data to select and serve an advertisement (or to conduct any third-party analytics or otherwise monetize user data), the developer and its partner SDKs pass identifying user data to an ever-increasing host of third parties, who, in turn, may pass

---

[26] Comments of The Center for Digital Democracy, et al., FTC. *In the Matter of Children's Online Privacy Protection Rule* at 13-14 (Dec. 23, 2011).
[27] Staff Report, "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy," Permanent Subcommittee on Investigations of the U.S. Senate Homeland Security and Governmental Affairs Committee (May 15, 2014), at 1 (emphasis added).

along that same data to *their* affiliates. Each entity may use that data to track users over time and across the Internet, on a multitude of increasingly complex online pathways, with the shared goal of targeting users with advertisements.

64.     The ability to serve targeted advertisements to (or to otherwise profile) a specific user no longer turns upon obtaining the kinds of data with which most consumers are familiar (name, email addresses, etc.), but instead on the surreptitious collection of persistent identifiers, which are used in conjunction with other data points to build robust online profiles. These persistent identifiers are better tracking tools than traditional identifiers because they are unique to each individual, making them more akin to a social security number. Once a persistent identifier is sent "into the marketplace," it is exposed to—and thereafter may be collected and be used by— an almost innumerable set of third parties.

65.     Permitting technology companies to obtain children's persistent identifiers exposes those children to targeted advertising. The ad networks, informed by the surreptitious collection of Personal Data from children, will assist in the sale of advertising placed within the gaming apps and targeted specifically to children.

66.     As described herein, Imangi and its Advertising Partners exfiltrate children's Personal Data or other information about their online behavior, which is then sold to third parties who track multiple data points associated with those children, analyzed with sophisticated algorithms to create a user profile, and then used to serve targeted advertising to children whose profiles fit a set of demographic and behavioral traits.

C.     **Imangi Contracts with Numerous SDKs to Exfiltrate Children's Personal Data for the Purpose of Commercial Exploitation.**

67.     Since the introduction of the Temple Run Apps in 2011 up until the present, Imangi has partnered with numerous advertising technology companies, embedding their SDKs into the Temple Run Apps to exfiltrate children's Personal Data for the purpose of tracking them over time and across the internet for psychological and commercial exploitation.

68.     These Advertising Partners with whom Imangi has partnered to show third-party ads in Temple Run Apps include, but are not limited to, the following: AdColony, AdMob (Google's advertising SDK), Applovin, Chartboost, Facebook, Inmobi, ironSource, Smaato, TapJoy, Unity, and Vungle.

69.     As examples, five of the Advertising Partners are highlighted below.

70.     **Facebook:** Facebook is one of the largest data aggregators in the world. Facebook's popularity hinges upon the ability of its users to communicate with one another. As the company stated in a Securities and Exchange Commission filing in anticipation of its May 2013 initial public offering "[p]eople use Facebook to stay connected with their friends and family, to discover what is going on in the world around them, and to share and express what matters to them to the people they care about . . . . We believe that we are at the forefront of enabling faster, easier, and richer communication between people and that Facebook has become an integral part of many of our users' daily lives."[28] Since its inception, Facebook continuously has been scrutinized by regulators for its abusive data-handling practices, including with regards to children's data.[29]

71.     Facebook is in the business of collecting Personal Data to track and profile users—including children—and sharing that Personal Data with publishers, advertisers, service providers, and Facebook affiliates. Imangi engages Facebook to perform these same services. Imangi and Facebook do not provide parents the disclosures and notice required by the law, nor do they obtain verified parental consent prior to harvesting children's Personal Data through Facebook's SDK.

72.     **AdColony:** AdColony is a mobile video ad network that purports to provide "better technology for better mobile ads."[30] As an ad network, AdColony works with both app developers and brands seeking to place video ads on apps to generate revenue through this advertising.[31]

---

[28] Form S-1 Registration Statement for Facebook, Inc., as filed with the Securities and Exchange Commission, "Prospectus Summary," at 1 (Feb. 1, 2012), http://www.sec.gov/Archives/edgar/data/1326801/000119312512034517/d287954ds1.htm (accessed April 5, 2022).
[29] *See, e.g.,* FTC, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019)  https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions (accessed April 5, 2022).
[30] AdColony, https://www.adcolony.com/  (accessed April 5, 2022).
[31] *Id.*

AdColony claims that it is "the trusted source of in-app inventory for brands where direct supply and programmatic expertise combine to create true advertiser success."[32] As for app developers like Imangi, AdColony urges prospective clients to "Monetize with the Leader," stating that it will provide access to the world's top mobile publishers to fill their ad space, including through a variety of video ads.[33]

73.    AdColony is in the business of collecting Personal Data to track and profile users—including children—and sharing that Personal Data with publishers, advertisers, service providers, and AdColony affiliates. Imangi engages AdColony to perform these same services. Imangi and AdColony do not provide parents the disclosures and notice required by the law, nor do they obtain verified parental consent prior to harvesting children's Personal Data through AdColony's SDK.

74.    **ironSource:** ironSource is a mobile advertising company that helps developers "focus on what they do best – creating great apps and user experiences – while we enable their business expansion in the app economy."[34] In other words, it helps developers who want to offer free apps make money through advertising revenue. ironSource does this by using data to target potential app customers (it calls this "multi-touchpoint targeting") and by providing ads for placement inside the app, telling developers it can "maximize revenue, encourage engagement, and keep users playing."[35]

75.    ironSource is in the business of collecting Personal Data to track and profile users—including children—and sharing that Personal Data with publishers, advertisers, service providers, and ironSource affiliates. Imangi engages ironSource to perform these same services. Imangi and ironSource do not provide parents the disclosures and notice required by the law, nor do they obtain verified parental consent prior to harvesting children's Personal Data through ironSource's SDK.

---

[32] AdColony, https://www.adcolony.com/brands-and-agencies/ (accessed April 5, 2022).
[33] AdColony, https://www.adcolony.com/developers/ (accessed April 5, 2022).
[34] ironSource, https://www.is.com/about/ (accessed April 5, 2022).
[35] ironSource, https://www.is.com/monetization/ (accessed April 5, 2022).

76.    **Unity:** Unity is a mobile advertising company. Unity markets its ability to increase user engagement with mobile apps and deliver profitable targeted advertisements. As it states on its website, "[w]hether you need to monetize your game or acquire users," Unity's technology enables developers to "[g]et deeper insights into players and create tailored experiences with analytics and engagement solutions."[36] Unity's SDK technology collects user information for purposes of serving targeted advertisements, including the use of machine-based learning to improve "targeting accuracy" – Unity's "SDKs provide visibility of session and in-app purchase events over your game's entire user base. Our machine learning technology uses this data along with contextual signals to help optimize campaigns to more accurately target players."[37]

77.    Unity is in the business of collecting Personal Data to track and profile users—including children—and sharing that Personal Data with publishers, advertisers, service providers, and Unity affiliates. Imangi engages Unity to perform these same services. Imangi and Unity do not provide parents the disclosures and notice required by the law, nor do they obtain verified parental consent prior to harvesting children's Personal Data through Unity's SDK.

78.    **Vungle:** Vungle is a mobile advertising company that claims to be "designed to help you monetize your users."[38] This monetization occurs by delivering targeted ads: "By working with some of the biggest names in the mobile world, we'll show your users the right ads at the right time, increasing conversions and earning more for every ad."[39]

79.    Vungle is in the business of collecting Personal Data to track and profile users—including children—and sharing that Personal Data with publishers, advertisers, service providers, and Vungle affiliates. Imangi engages Vungle to perform these same services. Imangi and Vungle do not provide parents the disclosures and notice required by the law, nor do they obtain verified parental consent prior to harvesting children's Personal Data through Vungle's SDK.

---

[36] Unity, https://unity.com/solutions/unity-ads (accessed April 5, 2022).
[37] Unity, https://unity.com/solutions/mobile-business/sdk-for-advertisers (accessed April 5, 2022)
[38] Vungle, https://vungle.com/monetize/ (accessed April 5, 2022).
[39] *Id.*

**D.      Imangi Misleadingly and Deceptively States That it Does Not Collect Personal Data from Children Who Play Temple Run Gaming Apps.**

80.      Since the launch of the Temple Run Apps, Defendant has embedded SDKs into its Apps, to indiscriminently track each user who plays any given App, for purposes of profiling and targeted advertising.

81.      Similarly, since the launch of the Temple Run Apps, Defendant has aggressively marketed the Apps towards children, knowingly and purposely cultivating a child audience through marketing measures like, *inter alia*, books, toys, fast food prizes, and even sleep wear. *See, e.g., Figs. 6-12, supra.*

82.      Put together, Defendant indisputably knew that (1) Temple Run Gaming Apps are intended for, and targeted to, young children, (2) a large portion of Defendant's audience for the Temple Run Gaming Apps was young children, and (3) *any* user who played a Temple Run Gaming App would have his or her Personal Data acquired for targeting and profiling purposes. In fact, as described, *supra*, Defendant knew, as of 2013, that Temple Run won a "Kids' Choice Award" for "Favorite App" from the child-oriented media network Nickelodeon.[40]   The following year, it urged its child audience to repeat this accolade:



*See, Fig. 2, supra.*

---

[40] Sierra McCleary-Harris, "Temple Run Wins Nickelodeon Kids' Choice Award, Unveils New Licensing Partnerships," Toybook (April 1, 2013) (available at https://toybook.com/temple-run-wins-nickelodeon-kids-choice-award-unveils-new-licensing-partnerships/) (accessed April 5, 2022).

83.    However, in its Privacy Policy, Defendant told parents—and continues to tell parents—it does not knowingly collect any information from children who play the Temple Run Gaming Apps. This is simply not true. Defendant knows that a large portion of its Temple Run audience is children. It zealously cultivates that audience. And Temple Run knows that it collects Personal Information from all users indiscriminately, without making any effort to treat child users differently.

84.    Specifically, since at least September 29, 2015,[41] Defendant's Privacy Policy has stated, in pertinent part (emphasis added):

| Defendant's Privacy Policy | Date |
|---|---|
| If you are under 13 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access the Services. Imangi encourages parents and/or guardians to play an active role in their children's online experience at all times. **Imangi does not knowingly contact or collect information from children under 13**. If you believe Imangi has inadvertently collected such information, please contact us so Imangi can promptly obtain parental consent or remove the information. | September 29, 2015[42] |
| If you are under 13 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access the Services. Imangi encourages parents and/or guardians to play an active role in their children's online experience at all times. **Imangi does not knowingly contact or collect information from children under 13**. If you believe Imangi has inadvertently collected such information, please contact us so Imangi can promptly obtain parental consent or remove the information. | October 19, 2016[43] |
| | |

---

[41]    Defendant's current Privacy Policy (available at https://www.imangistudios.com/privacy/privacy-policy.html) purports to list all historical privacy policies, starting on September 29, 2015 (*Previous Privacy Policies*) (accessed April 5, 2022). Each is incorporated herein by reference.

[42] https://grt.szx.mybluehost.me/privacy-old/29-September-2015.html (accessed April 5, 2022).

[43] https://www.imangistudios.com/privacy-old/19-October-2016.html (accessed April 5, 2022).

| | |
|---|---|
| If you are under 13 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access the Services. Imangi encourages parents and/or guardians to play an active role in their children's online experience at all times. **Imangi does not knowingly contact or collect information from children under 13**. If you believe Imangi has inadvertently collected such information, please contact us so Imangi can promptly obtain parental consent or remove the information. | October 17, 2017[44] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us (information below) so we can promptly remove the information. | May 18, 2018[45] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us (information below) so we can promptly remove the information. | July 12, 2018[46] |
| | |

---

[44] https://www.imangistudios.com/privacy-old/17-October-2017.html (accessed April 5, 2022).
[45] https://www.imangistudios.com/privacy-old/18-May-2018.html (accessed April 5, 2022).
[46] https://www.imangistudios.com/privacy-old/12-July-2018.html (accessed April 5, 2022).

| | |
|---|---|
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us (information below) so we can promptly remove the information. | November 21, 2018[47] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us (information below) so we can promptly remove the information. | February 6, 2019[48] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us | September 6, 2019[49] |

[47] https://www.imangistudios.com/privacy-old/21-November-2018.html (accessed April 5, 2022).
[48] https://www.imangistudios.com/privacy-old/06-February-2019.html
[49] https://www.imangistudios.com/privacy-old/06-September-2019.html

| | |
|---|---|
| (information below) so we can promptly remove the information. | |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. **Imangi's products are intended for general audiences and do not knowingly collect any personal information from children under the age of 16**. If you are under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. If you believe Imangi has inadvertently collected such information, please contact us (information below) so we can promptly remove the information. | November 22, 2019[50] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. Imangi's products are not intended for children under the age of 13 and **we do not knowingly collect any personal information from children under the age of 13**. If you are a resident of the European Economic Area (EEA) under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. Additional age-based privacy information specific to California residents is set forth below in the Privacy Notice for California residents. If you believe Imangi has inadvertently collected information about your child, please contact us (information below) so we can promptly remove the information. | February 20, 2020[51] |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. Imangi's products are not intended for | February 28, 2020[52] |

---

[50] https://www.imangistudios.com/privacy-old/22-November-2019.html
[51] https://www.imangistudios.com/privacy-old/20-February-2020.html
[52] https://www.imangistudios.com/privacy-old/28-February-2020.html

| | |
|---|---|
| children under the age of 13 and **we do not knowingly collect any personal information from children under the age of 13**. If you are a resident of the European Economic Area (EEA) under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. Additional age-based privacy information specific to California residents is set forth below in the Privacy Notice for California residents. If you believe Imangi has inadvertently collected information about your child, please contact us (information below) so we can promptly remove the information. | |
| Protecting children's privacy is extremely important to us. We also encourage parents and/or guardians to play an active role in their children's online experiences at all times. Imangi's products are not intended for children under the age of 13 and **we do not knowingly collect any personal information from children under the age of 13**. If you are a resident of the European Economic Area (EEA) under 16 years of age or a minor in your country of residence, please ask your legal guardian's permission to use or access Imangi's products. Additional age-based privacy information specific to California residents is set forth below in the Privacy Notice for California residents. If you believe Imangi has inadvertently collected information about your child, please contact us (information below) so we can promptly remove the information. | September 29, 2020[53] |

85.     Thus, at all relevant times, Defendant represented that it did not collect Personal Data from children of certain ages (13 or 16, depending upon the year). Yet it simultaneously, actively marketed the Temple Run Apps to said children. During this same time period, and continuing through the present, Defendant marketed its Temple Run Apps to children via a host of different child-oriented merchandise, from books to games to pajamas and more. Defendant *obviously* knew that its audience included children—indeed, its Temple Run App won a Kids'

---

[53] https://www.imangistudios.com/privacy-old/29-September-2020.html (accessed April 5, 2022).

Choice Award in 2013, which Defendant sought to replicate through a social media campaign the following year. Thus, when Defendant stated it did not "knowingly collect any information from children under the age of [13 or 16]," the only conclusion to be drawn is that Defendant was simply not *collecting* Personal Data, and not that Defendant was choosing to ignore the fact that children were playing its Apps.

86.    Imangi intentionally mislead parents and children into believing that they could play the Temple Run Apps in privacy, when in reality the Advertising Partners (and countless others) were gathering the children's Personal Data.

**E.    Imangi's Privacy-Invasive, Surreptitious Conduct Harms Children and Egregiously Violates Entrenched Social Norms.**

**1.    Imangi and Its Advertising Partners Use Children's Personal Data to Target Them, Despite Children's Heightened Vulnerability to Advertising.**

87.    Imangi and its Advertising Partners use children's Personal Data to serve them targeted advertising. They engage in this illegal behavior despite the known risks associated with and ethical norms surrounding advertising to children.[54]

88.    Advertisers regard children to be valuable advertising targets.[55] Children influence the buying patterns of their families—an influence that amounts to billions of dollars each year—and have lucrative spending power themselves.[56] Children and teens are thus prime targets for advertisers.

89.    Imangi intentionally collects and exploits children's Personal Data in order to profit from the advertising SDKs embedded in its Temple Run Apps.

---

[54] Kristien Daems, Patrick De Pelsmacker & Ingrid Moons, *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. of Marketing Communications (2017) at 13 ("In general, all advertising professionals acknowledge that children are a vulnerable advertising target group.").

[55] Lara Spiteri Cornish, *'Mum, can I play on the Internet?' Parents' understanding, perception, and responses to online advertising designed for children*, 33 Int'l J. Advertising 437, 438 (2014) ("Indeed, in recent years, marketers targeting children have developed a strong online presence . . ."); Issie Lapowsky, "Why Teens are the Most Elusive and Valuable Customers in Tech," Inc., *available at* https://www.inc.com/issie-lapowsky/inside-massive-tech-land-grab-teenagers.html (accessed on April 5, 2022).

[56] Sandra L. Calvert, *Children as Consumers: Advertising and Marketing*, 18 Future Child 205, 207 (2008).

90.    For example, on June 4, 2014, Defendant's co-founder and co-creator, Keith Shepherd, gave an interview where he that the Temple Run Apps operate in a "user acquisition-driven market, where everyone's looking for ways to buy users and track them, from the point of clicking an add all the way to installing an app."[57]

91.    Imangi targets advertising efforts at children despite widespread awareness that children are more vulnerable to deception by advertisements because they are easily influenced by the content, lack the cognitive skills to understand the intention of advertisers, and can struggle to distinguish between advertisements and other content.[58] This is particularly problematic when targeted advertising is used because it is designed to more effectively sway target audiences.[59] Research supports that online advertisements pose heightened risks to children.[60]

92.    Exposure to advertising can also lead to negative outcomes for children, including increasing conflict with their parents, cynicism, health issues, and increased materialism.[61]

93.    Children often lack the skills and knowledge necessary to assess and appreciate the risks associated with online data exfiltration and tracking.[62] Even attempts to disclose privacy-violative behavior are not easily understood.  Research has found that policies explaining the exfiltration and use of children's data are difficult even for adults to understand, and marketers make no effort to explain their targeted marketing practices to child and teen audiences in developmentally appropriate and easy-to-understand ways.[63] This practice "could mislead these

---

[57] GamesBeat, *Even with a Temple Run empire, Imangi Studios wants to stay indie at heart,* https://venturebeat.com/2014/06/04/even-with-a-temple-run-empire-imangi-studios-wants-to-stay-indie-at-heart-interview/ (accessed on April 5, 2022).

[58] *Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues, infra* at fn.76, at 1510 (collecting studies); *Children as Consumers: Advertising and Marketing, supra* at fn.56; *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors, supra* at n. 54, at 2 (collecting studies); *'Mum, can I play on the internet?', supra* at fn.55, at 438-39 (collecting studies).

[59] Olesya Venger, *Internet Research in Online Environments for Children: Readability of Privacy and Terms of Use Policies; The Uses of (Non)Personal Data by Online Environments and Third-Party Advertisers,* 10 Journal of Virtual Worlds Research 1, 8 (2017).

[60] *'Mum, can I play on the Internet?', supra* at fn.55, at 440-42 (collecting studies).

[61] *Children as Consumers: Advertising and Marketing, supra* at fn.56, at 118-119.

[62] Ilene R. Berson & Michael J. Berson, *Children and their Digital Dossiers: Lessons in Privacy Rights in the Digital Age,* 21 Int'l J. of Social Education 135 (2006).

[63] *Internet Research in Online Environments for Children, supra* at fn.59, at 9.

vulnerable emerging consumers into thinking that they are only playing games and their data are not collected for any purpose."[64]

### 2. Imangi and Its Advertising Partners Exfiltrate and Analyze Children's Personal Data to Track the Effect of Their Ads on Children's Behavior.

94. In the Temple Run Apps, children's Personal Data is exfiltrated and analyzed before and after serving advertisements. On the front end, the data helps Imangi and its Advertising Partners know what ads to serve (based on children's demographics and behaviors). On the back end, the data helps them determine whether the ad succeeded in affecting children's behavior, a practice known as ad attribution.

95. These entities track the impact and value of the ads served by tracking children's activities across the Internet after they interact with those ads.

96. Imangi and its Advertising Partners want to reward advertisers whose ads influenced children's behavior. But such attribution requires surveillance. For example, if 10-year-old Sally is served an ad for a pony game based on her age, implied income, and online activities, and later goes and downloads that pony game, the advertiser responsible for the pony game ad wants that download attributed to them, so that they can get paid for that action. But the only way for the advertising companies to connect the Sally that saw the ad with the Sally that downloaded the app is to track Sally's online activities after she was shown the ad through the app—such as by tracking her persistent identifiers.

97. This ongoing exfiltration, tracking, and analysis violates children's privacy and exploits their vulnerabilities.

### 3. Imangi and its Advertising Partners Use Personal Data to Encourage Children to Continue Using the Temple Run Apps, Increasing the Risks Associated with Heightened Mobile Device Usage.

98. Imangi and its Advertising Partners, and the host of other third-party advertisers to whom Defendant makes children's Personal Data available, benefit from increased mobile device usage among children. The longer and more often a child plays Imangi's games, the more Personal

---

[64] *Id.* at 10.

Data about that child the SDKs can exfiltrate and commercialize. This increased opportunity to exfiltrate and monetize children's Personal Data and expose them to advertising is critically important to Imangi and its Advertising Partners.[65]

99.    The mobile advertising ecosystem actively feeds increases in app use and mobile device addiction. Imangi and its Advertising Partners use Personal Data to program their apps to "hook" children, and to keep them playing the app.[66]

100.    A key service promoted by the SDKs to Imangi and others is its ability to help apps retain their users, *i.e.*, to keep children playing their apps and thereby increase their profits. Children are specifically targeted as part of this goal.

101.    These retention services are fueled by children's Personal Data. To enhance retention, the SDKs use children's Personal Data to analyze their demographics and behavior, and trigger events—both within the app and across the Internet—that will encourage them to play any app more often and for longer periods.

102.    The SDKs exfiltrate children's Personal Data from their devices and use it for tracking and targeting to entice the children to play the Temple Run Apps longer and more often. The SDKs use sophisticated algorithms to determine whether and when to target children with specific in-app cues or out-of-app ads. This behavior increases the revenue of Imangi and its Advertising Partners, all the while violating children's privacy and exposing them to the negative outcomes associated with increased mobile device usage by children.

103.    These "retention" efforts take place in a context where mobile device usage among children is widespread and growing. As of 2020, 97% of families with children younger than 8-years-old had a smartphone, and 75% had a tablet.[67] The proportion of homes with a tablet has nearly doubled since 2013.[68] Often, children have their own devices; as of 2020, 48% of children

---

[66] "Brain Hacking," *infra* at fn.84; *Glow Kids*, *infra* at fn.82, at XVIII-XIX, 22, 32.
[67] The Common Sense Census: Media Use By Kids Age Zero To Eight, Common Sense Media (2020), https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-age-zero-to-eight-2020 (accessed on April 5, 2022).
[68] *Id.*

younger than 8-years-old had their own mobile device, up from only 3% in 2011 and 12% in 2013.[69]

104.    Children spend increasingly more time on mobile devices.  On average, a child younger than 8-years-old spends 55 minutes every day on a mobile device, nearly four times the average time spent in 2013,[70] while children between the ages of eight and twelve spend 141 minutes on mobile devices and teens spend 252 minutes.[71]  Mobile games are popular among children, second only to watching TV or videos.[72]  Children younger than 8-years-old spend an average of 13 minutes every day gaming, more than doubling since 2013.[73]  27% of children ages 8 to 18 report playing mobile games every day,[74] and those who play games average about 80 minutes every day doing so.[75]

### F.    Imangi's Practice of Secretly Tracking and Profiling Children Via Their Personal Data Violates Longstanding, Deeply Held Societal Norms That Value and Protect Individuals' Privacy In General and Children's Privacy In Particular

105.    Invasion of privacy has been recognized as a common law tort for over a century. *See Matera v. Google Inc.*, 15-CV-0402, 2016 WL 5339806, at *10 (N.D. Cal, Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition that "the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'"). *See Wal-Mart Stores, Inc. v. Lee*, 74 S.W.3d 634, 644 (Ark. 2002) (Adopting the Restatement (Second) of Torts § 652B and defining an intrusion claim as follows: "One who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a

---

[69] *Id.*

[70] *Id.* at 25

[71] Victoria Rideout, "The Common Sense Census: Media Use by Tweens and Teens," Common Sense Media (2019) at 21  https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-tweens-and-teens-2019 (accessed on April 5, 2022).

[72] *Media Use By Kids Age Zero To Eight*, *supra* at fn.67, at 18.

[73] *Id.* at 25.

[74] Media Use by Tweens and Teens, *supra* at fn. 71, at 17.

[75] *Id.* at 15.

reasonable person."). As Justice Brandeis explained in his seminal article, *The Right to Privacy*, "[t]he common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890). The Second Restatement of Torts—and, as set forth *supra*—the Supreme Court of Arkansas—recognizes the same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652B (1977). The Supreme Court similarly recognized the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

106.    More recently, the Supreme Court explicitly recognized the reasonable expectation of privacy an individual has in her cell phone, and the Personal Data generated therefrom, in its opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). There, the Court held that continued access of an individual's cell phone location data constituted a search under the Fourth Amendment because "a cell phone—almost a "feature of human anatomy[]"—tracks nearly exactly the movements of its owner . . . A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales . . . Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).

107.    And, even more recently, the Northern District of California, in an order denying a motion to dismiss an intrusion upon seclusion claim for the exfiltration of children's Personal Data in different mobile apps, held that "current privacy expectations are developing, to say the least, with respect to a key issue raised in these cases – whether the data subject owns and controls his or her personal information, and whether a commercial entity that secretly harvests it commits a highly offensive or egregious act." *McDonald v. Kiloo ApS*, 385 F. Supp.3d 1022, 1035 (N.D. Cal.

2019).  The *McDonald* court's reasoning was subsequently adopted in the District of New Mexico in analogous litigation.  *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1127 (D.N.M. 2020), *on reconsideration*, No. 18-854 MV/JFR, 2021 WL 354003 (D.N.M. Feb. 2, 2021).

108.    It is precisely because of our devices' capacity for "near perfect surveillance" that courts have consistently held that time-honored legal principles recognizing a right to privacy in one's affairs naturally apply to online monitoring.

### 2.    Defendant's Breach of Privacy Norms Is Compounded by Defendant's Targeting, Tracking, and Profiling of Children.

109.    Defendant's unlawful intrusion into Plaintiff's privacy is made even more egregious and offensive by the fact that the Defendant and their SDK partners have targeted and collected *children*'s information, without obtaining parental consent. A reasonable person believes the conduct described herein violates children's expectations of privacy.

110.    Further, parents' interest in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by society.  The history of Western civilization reflects a strong tradition of parental concern for the nurture and upbringing of children in light of children's vulnerable predispositions.  Our society recognizes that parents should maintain control over who interacts with their children and how, in order to ensure the safe and fair treatment of their children.

111.    As the use of mobile devices rises, so too do awareness of and concern about the effects of this use on children.[76]  The consequences of mobile device overuse, particularly among

---

[76] *See, e.g.*, Xiaomei Cai and Xiaoquan Zhao, *Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues*, 29 Computers in Human Behavior 1510-1518 (2013); Barry Rosenstein and Anne Sheehan, "Open letter from JANA Partners and CALSTRS to Apple Inc.," Jan. 6, 2018, https://corpgov.law.harvard.edu/2018/01/19/joint-shareholder-letter-to-apple-inc/ (letter to Apple citing "growing body of evidence" that increasing mobile device use leads to "unintentional negative consequences" for young users) (accessed April 5, 2022).

children, is well-known in the tech industry,[77] with many industry leaders refusing to allow their own children to own or use devices,[78] or attend schools where such devices are prevalent.

112.    In a recent study, 48% of parents of 5- to 8-year-olds reported difficulty getting their children to turn off mobile devices.[79] 26% of teens and 50% of kids age 8-12 report that their parents monitor what they do on their digital devices through an app or other tools.[80] Parents are increasingly concerned about their children's mobile device usage, and for good reason: research has associated increasing usage with negative consequences for children,[81] such as increasing rates of ADHD,[82] depression,[83] anxiety,[84] and reduced focus in the classroom.[85] One recent study showed that children between the ages of 12 and 18 who spent more time playing games had lower than average social-emotional well-being.[86]

113.    Most parents believe that children are better off spending less time on their mobile devices.[87] Three out of four parents are worried about their children's use of screen devices.[88] A recent study showed that 67% of parents of children under age 8 worry about companies collecting

---

[77] *See, e.g.*, Farhad Majoo, "It's Time for Apple to Build a Less Addictive iPhone," New York Times (Jan. 17, 2018), https://www.nytimes.com/2018/01/17/technology/apple-addiction-iphone.html ("Tech 'addiction' is a topic of rising national concern.") (accessed April 5, 2022); Thuy Ong, "Sean Parker on Facebook: 'God only knows what it's doing to our children's brains'," The Verge (Nov. 9, 2017), https://www.theverge.com/2017/11/9/16627724/sean-parker-facebook-childrens-brains-feedback-loop (former tech industry leader recognizing that app creators intentionally "exploit[] human vulnerabilities" to increase app engagement) (accessed April 5, 2022).

[78] Nick Bilton, "Steve Jobs Was a Low-Tech Parent," New York Times (September 10, 2014), https://www.nytimes.com/2014/09/11/fashion/steve-jobs-apple-was-a-low-tech-parent.html (accessed on April 5, 2022); Claudia Dreifus, "Why We Can't Look Away From Our Screens," New York Times (March 6, 2017), https://www.nytimes.com/2017/03/06/science/technology-addiction-irresistible-by-adam-alter.html (accessed on April 5, 2022).

[79] *Media Use By Kids Age Zero To Eight*, *supra* at fn.67, at 40.

[80] *Media Use by Tweens and Teens*, *supra* at fn.71, at 55.

[81] Ryan M. Atwood et al., Adolescent Problematic Digital Behaviors Associated with Mobile Devices, 19 North American J. Psychology 659-60 (2017) (collecting studies); *Id.* at 672-73 (finding that more than 82.5% of teens were classified as over-users of the Internet, and finding that mobile device usage increased Internet usage).

[82] Nicholas Kardaras, *Glow Kids* 123-124 (2016).

[83] *Id.* at 127.

[84] *Id.*; 60 Minutes, "Brain Hacking",https://www.youtube.com/watch?v=awAMTQZmvPE (accessed on April 5, 2022).

[85] *Glow Kids*, *supra* at fn.82, at 123.

[86] *Media Use by Tweens and Teens*, *supra* at fn.71, at 79.

[87] *Media Use By Kids Age Zero To Eight*, *supra* at fn.67, at 39.

[88] *Id.* at 42.

data about their children through media, while 69% are concerned about too much advertising.[89] Such fear is well-founded. The World Health Organization ("WHO") recently added "gaming disorder" to its globally recognized compendium of medical conditions and diagnoses. In the 11th International Classification of Diseases, the WHO describes the condition as "impaired control over gaming, increasing priority given to gaming over other activities to the extent that gaming takes precedence over other interests and daily activities, and continuation or escalation of gaming despite the occurrence of negative consequences."[90]

114.    A survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of more than 2,000 adults found overwhelming support for the basic principles of privacy embedded in state common law, as well as federal law.[91] The parents who were polled responded as follows when asked whether they agreed or disagreed with the following statements:

a.      "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

- 5% strongly agree
- 3% somewhat agree
- 15% somewhat disagree
- **75% strongly disagree**
- 3% do not know or refused to answer

b.      "As long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

- 3% strongly agree
- 17% somewhat agree
- 10% somewhat disagree
- **69% strongly disagree**
- 1% do not know or refused to answer

---

[89] *Id.*

[90] World Health Organization, "Gaming Disorder", http://www.who.int/features/qa/gaming-disorder/en/ (accessed April 5, 2022); *see also* Haley Tsukayama, "Video Game Addiction is a Real Condition, WHO Says. Here's What That Means." Washington Post (Jun. 18, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/06/18/video-game-addiction-is-a-real-condition-who-says-heres-what-that-means/?utm_term=.9f718977d0e5 (accessed April 5, 2022).

[91] Center for Digital Democracy, "Survey on Children and Online Privacy, Summary of Methods and Findings," http://www.centerfordigitaldemocracy.org/sites/default/files/COPPA%20Executive%20Summary%20and%20Findings.pdf

      c.     "It is okay for advertisers to collect information about a child's location from that child's mobile phone."

- 6% strongly agree
- 3% somewhat agree
- 7% somewhat disagree
- **84% strongly disagree**
- less than 1% do not know or refused to answer

      d.     "Before advertisers put tracking software on a child's computer, advertisers should receive the parent's permission."

- **89% strongly agree**
- 5% somewhat agree
- 2% somewhat disagree
- **4%** strongly disagree
- less than 1% do not know or refused to answer

      e.     When asked: "There is a federal law that says that online sites and companies need to ask parents' permission before they collect personal information from children under age 13. Do you think the law is a good idea or a bad idea?" 93% said it was a good idea, 6% said it was a bad idea, and 1% did not know or refused to answer.

      f.     Non-parent adults tended to answer in the same way, although parents were more protective of their children's privacy.

     115.    In a 2013 primer designed for parents and kids to understand their privacy rights online, the CDD noted similar findings:[92]

      a.     91% of both parents and adults believe it is not okay for advertisers to collect information about a child's location from that child's mobile phone.

      b.     96% of parents and 94% of adults expressed disapproval when asked if it is "okay OK [sic] for a website to ask children for personal information about their friends."

      c.     94% of parents, as well as 91% of adults, believe that advertisers should receive the parent's permission before putting tracking software on a child's computer.

---

[92] *See* Center for Digital Democracy, "The New Children's Online Privacy Rules: What Parents Need to Know," 6 (June 2013), https://www.democraticmedia.org/sites/default/files/CDDCOPP AParentguideJune2013.pdf (accessed April 5, 2022).

116.    In a Pew Research Center study, 79% of adults say they are "at least somewhat concerned about how companies are using the data it collects about them."[93] Specifically, 84% of adults say they are least a little concerned about how much personal information advertisers might know about them.[94]

117.    According to the same study, 81% of Americans "say they have very little or no control over the data collected about them by . . . companies."[95]

118.    Smartphone owners are especially active when it comes to these behaviors. Some 50% of smartphone owners have cleared their phone's browsing or search history, while 30% have turned off the location tracking feature on their phone due to concerns over who might access that information.[96] Such behaviors exemplify people's expectation that their Personal Information— including their location—not be tracked by others online.

119.    In another study by the Pew Research Center done as part of its "Internet & American Life" project, respondents were asked, "Which of the following statements comes closest to exactly how you, personally, feel about targeted advertising being used online—even if neither is exactly right?" 68% said, "I'm not okay with it because I don't like having my online behavior tracked and analyzed." 28% said, "I'm okay with it because it means I see ads and get information about things I'm really interested in."[97] Thus, more often than not, attitudes toward data collection for use in targeted advertising are negative.

120.    A survey of 802 parents and their age 12- to 17-year-old teenage children showed that "81% of parents of online teens say they are concerned about how much information

---

[93] *See* Brooke Auxier, et al., *Americans concerned, feel lack of control over personal data collected by both companies and the government*, Nov. 15, 2019, https://www.pewresearch.org/internet/20 19/11/15/americans-concerned-feel-lack-of-control-over-personal-data-collected-by-both-companies-and-the-government/ (accessed April 5, 2022).

[94] *Id.*

[95] *Id.*

[96] Jan Lauren Boyles, *et al.*, *Privacy and Data Management on Mobile Devices*, Pew Research Center, Sept. 5, 2012, https://www.pewresearch.org/internet/2012/09/05/privacy-and-data-management-on-mobile-devices/ (accessed April 5, 2022).

[97] Kristen Purcell, *et al.*, *Search Engine Use*, Pew Research Center 2012 https://www.pewresearch.org/internet/2012/03/09/search-engine-use-2012/ (accessed April 5, 2022).

advertisers can learn about their child's online behavior, with some 46% being 'very' concerned."[98]

121.    A study comparing the opinions of young adults between the ages of 18 to 23 with other typical age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage is in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions.[99] For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.

122.    The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them." A majority of the 18-24 year olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's Personal Data illegally; across all age groups, 69% of individuals opted for the highest fine. Finally, beyond a fine, around half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally—putting them out of business and jail time.

123.    Another study's "findings suggest that if Americans could vote on behavioral targeting today, they would shut it down." The study found that 66% of 1000 polled individuals over the age of 18 did not want online advertisements tailored for them, and that when the same individuals were told that tailored advertising was "based on following them on other websites they have visited," the percentage of respondents rejecting targeted advertising shot up to 84%.[100]

---

[98] Mary Madden, *et al.*, *Parents, Teens, and Online Privacy*, Pew Research Center 2012, https://www.pewresearch.org/internet/2012/11/20/parents-teens-and-online-privacy/ (accessed April 5, 2022).

[99] Chris Hoofnagle, et al., *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies?* (2010), http://ssrn.com/abstract=1589864 (accessed April 5, 2022).

[100] Joseph Turow, et al., *Contrary to What Marketers Say, Americans Reject Tailored Advertising and Three Activities that Enable It* (2009), http://ssrn.com/abstract=1478214 (accessed April 5, 2022).

124.    Even when consumers are told that online companies will follow them "anonymously," Americans are still averse to this tracking: 68% definitely would not allow it, and 19% would probably not allow it.

125.    The study found that 55% of 18–24-year-old Americans rejected tailored advertising when they were not informed about the mechanics of targeted advertising. As with the general sample, the percentage of rejections shot up to 67% when those 18–24-year-olds were informed that tailored advertising was based on their activities on the website they are visiting, and then 86% when informed that tailored ads were based on tracking on "other websites" they had visited. Despite the overwhelming aversion to targeted advertising, these findings suggest that public concern about privacy-intrusive targeted advertising is *understated* based on the fact that the public may not fully understand how a targeted advertisement is delivered to it. When properly understood by consumers, targeted advertising, and the tracking and profiling in the background, is decried across all age groups.

126.    A survey on consumer expectations in the digital world, conducted by Deloitte's Technology, Media & Telecommunications practice[101] and based on polling conducted in 2017 of 2,088 individuals (from the following age groups: ages 14-20 (born 1997-2003); ages 21-34 (born 1983-1996); ages 35-51 (born 1966-1982); ages 52-70 (born 1947-1965); ages 71+ (born 1946 or earlier) found:

        a.    73% of all U.S. consumers indicated they were concerned about sharing their Personal Data online and the potential for identity theft.

        b.    In 2017, there was a 10-point drop in willingness to share Personal Data in exchange for personalized advertising (from 37% to 27%).

        c.    The reason for the sudden change in U.S. consumers' attitudes is they overwhelmingly lack confidence in companies' ability to protect their data: 69% of respondents

---

[101] Kevin Westcott, et al., *Digital Media Trends Survey: A New World of Choice for Digital Consumers*, Center for Technology, Media & Telecommunications, 12th ed., https://www2.deloitte.com/content/dam/insights/us/articles/4479_Digital-media-trends/4479_Digital_media%20trends_Exec%20Sum_vFINAL.pdf (accessed April 5, 2022).

across generations believe that companies are not doing everything they can to protect consumers' Personal Data.

          d.      73% of all consumers across all generations said they would be more comfortable sharing their data if they had some visibility and control. In addition, 93% of U.S. consumers believe they should be able to delete their online data at their discretion.

          127.    In the same vein, one news organization recently summarized a *Journal of Consumer Research* article, capturing society's discomfort with and feelings of revulsion toward the practice of targeted advertising and the data exfiltration required: "There's something unnatural about the kind of targeting that's become routine in the ad world, this paper suggests, something taboo, a violation of norms we consider inviolable—it's just harder to tell they're being violated online than off. But the revulsion we feel when we learn how we've been algorithmically targeted, the research suggests, is much the same as what we feel when our trust is betrayed in the analog world."[102]

          128.    Beyond surveys and studies, various other sources provide manifestations of society's deep revulsion toward companies' collecting or accessing Personal Data for tracking and profiling purposes:

          a.      At common law, children under the age of eighteen do not have full capacity to enter into binding contracts with others. The law shields minors from their lack of judgment, cognitive development, and experience.

          b.      Under the federal Family Educational Rights and Privacy Act of 1974 ("FERPA"), students have a right of privacy regarding their school records, but the law grants parents a right to access and disclose such records. 20 U.S.C. § 1232g(a)(4).

---

[102] Sam Biddle, "You Can't Handle the Truth about Facebook Ads, New Harvard Study Shows" The Intercept (May 9, 2018), https://theintercept.com/2018/05/09/facebook-ads-tracking-algorithm/?utm_source=digg&utm_medium=email) (accessed April 5, 2022).

c.    The Children's Internet Protection Act prohibits entities such as schools and libraries from providing Internet access to children unless technological measures are put in place to prohibit children from accessing harmful content. 20 U.S.C. § 9134(f).

d.    More recently, Senators Edward J. Markey and Richard Blumenthal introduced a bill, the KIDS Act, and stated that "Big Tech has designed their platforms to ensnare and exploit children for more likes, more views, and more purchases."[103]

e.    *Most* recently, President Biden stated in his 2022 State of the Union address that "[i]t's time to strengthen privacy protections, ban targeted advertising to children, demand tech companies stop collecting personal data on our children," and that platforms collecting children's data needed to be held accountable for "the national experiment they're conducting on our children for profit."[104]

129.    The advertising industry's own privacy standards, and the self-regulatory agencies which serve it, also support enhanced protections for children online, including obtaining parental consent.

130.    For example, a survey of professionals in the advertising industry found that a "substantial majority of the respondents [advertising professionals] (79%) agrees that the collection of personal information of children should be prohibited," and over "[h]alf of the advertisers (56.8%) agrees with this statement if teenagers are concerned."[105]

131.    Further, "[t]he majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%)."

---

[103] Ed Markey, *Senators Markey and Blumenthal Introduce First-of-its-Kind Legislation to Protect Children Online From Harmful Content, Design Features*, https://www.markey.senate.gov/news/press-releases/senators-markey-and-blumenthal-introduce-first-of-its-kind-legislation-to-protect-children-online-from-harmful-content-design-features_ (accessed April 5, 2022).

[104] Joseph Duball, "Biden's State of the Union Remarks Put Children's Privacy Front and Center" IAPP (available at https://iapp.org/news/a/bidens-sotu-remarks-put-childrens-privacy-front-and-center/) (accessed April 5, 2022).

[105] *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors, supra* at fn.54.

132.    In the same vein, the Children's Advertising Review Unit, an arm of the advertising industry's self-regulation branch, recommends that companies take the following steps, *inter alia*, to meet consumers' reasonable expectations of privacy and avoid violating the law:[106]

a.    Advertisers have special responsibilities when advertising to children or collecting data from children online.  They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed.  They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

b.    Operators should disclose passive means of collecting information from children (e.g., navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

c.    Operators must obtain "verifiable parental consent" before they collect, use or disclose Personal Data to third parties, except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.

d.    To respect the privacy of parents, operators should not maintain, in retrievable form, information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

e.    Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

f.    Age-screening mechanisms should be used in conjunction with technology, e.g., a session cookie, to help prevent underage children from going back and changing their age to circumvent age-screening.

---

[106]    Children's    Advertising    Review    Unit,    https://bbbprograms.org/programs/all-programs/children's-advertising-review-unit  (accessed April 5, 2022).

133.    By failing to obtain parental consent, disclose to parents the nature of their data collection practices, and take other steps to preclude children from accessing apps that surreptitiously capture their Personal Data, Defendant has breached parents' and their children's reasonable expectation of privacy, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

### G.    Defendant's Omissions and Misrepresentations Create the False Impression That Temple Run is Compliant with Privacy Laws and Social Norms.

134.    Defendant markets the Temple Run Apps as being suitable for children, both explicitly (through public-facing representations) and implicitly (through the game's content, design, and distribution channels, as well as the child-directed merchandise associated with the Apps).

135.    However, despite doing so—and despite having indisputable knowledge that children play on the Apps—Defendant omits any mention of the privacy-invasive collection of Personal Data by the SDKs embedded within the Temple Run Apps; and indeed, makes affirmative misrepresentations regarding the collection of children's Personal Data.

136.    Defendant creates the false impression that Temple Run conforms to established norms regarding children's privacy, and that Defendant's behavior respects those norms.

137.    Temple Run is a gaming app whose subject matter, design, and distribution mechanisms all suggest that the app is appropriate for children. Temple Run users pretend to be an explorer who's obtained an ancient artifact and is trying to evade demonic monkeys trying to regain the artifact. The app is marketed for kids aged 9 and older in the Apple App store and for 'Everyone' in the Google Play Store.

138.    Defendant is aware of Temple Run's immense popularity among children and has sought to actively retain that youthful engagement.

## V.    NAMED PLAINTIFF ALLEGATIONS

139.    Beginning in or around 2016, one or more of Plaintiff's children—KCC, BAB, and LAB— downloaded Temple Run and Temple Run 2 onto mobile devices in order to play the games. KCC, BAB, and LAB thereafter frequently played Temple Run and/or Temple Run 2 on these or other devices on an ongoing and continuous basis. During this time, the ages of Plaintiff's children ranged from 7 to 17 years old.

140.    During the time KCC, BAB, and LAB played Temple Run and Temple Run 2, Defendant partnered with each of the Advertising Partners to collect the Personal Data of KCC, BAB, and LAB for the purposes of tracking, profiling, and targeting them.

141.    Prior to the forensic investigation conducted for this action, neither Plaintiff, KCC, BAB, nor LAB were aware of the existence of any of the Advertising Partners, did not know that Defendant had embedded the Advertising Partners' SDK code in the Apps the children were playing, and did not know the Defendant was exfiltrating the children's Personal Data—as they played the Apps—to track, profile, and target them.

142.    Defendant's tracking, profiling and targeting of KCC, BAB, and LAB without parental consent is highly offensive to Plaintiff and constitutes an invasion of her children's privacy and of Plaintiff's right to protect her children from this invasion.

## VI.    CLASS ALLEGATIONS

143.    Plaintiff seeks class certification of the class set forth herein pursuant to Arkansas Rule of Civil Procedure 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and (b).

144.    Plaintiff seeks certification of a Class defined as follows:

> All parents and/or legal guardians of persons residing in the State of Arkansas, who are younger than the age of 18, or were younger than the age of 18 when they played Temple Run, and from whom Defendant collected, used, or disclosed Personal Data.

145.    Plaintiff reserves the right to modify or refine the Class or definitions based upon discovery of new information and in order to accommodate any of the Court's concerns.

146.    Excluded from the Class are Defendant, and Defendant's parents, subsidiaries, affiliates, officers and directors, any entity in which any defendant has a controlling interest, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members, and members of the staffs of the judges to whom this case may be assigned.

147.    **Numerosity.** The Class is so numerous that joinder of individual members herein is impracticable.  The exact number of Class members, as herein identified and described, is not known, but Plaintiff believes at least 36 Class members reside within the State. *Stephens Prod. Co. v. Mainer*, 2019 Ark. 118, 5, 571 S.W.3d 905, 908 (2019) (numerosity requirement satisfied for class consisting of 36 individuals).  Additionally, the identity of class members can be readily determined upon review of records maintained by Defendant.

148.    **Commonality.** There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members, including the following:

   i. Whether Defendant engaged in the activities challenged in this Complaint, via its Temple Run Apps;

   ii. Whether Defendant's acts and practices complained of herein amount to acts of intrusion upon seclusion under the law of Arkansas; and

   iii. What is the appropriate injunctive relief to ensure Defendant no longer illegally collects children's Personal Data to track, profile, and target them over time and across different websites or online services.

149.    **Typicality.** Plaintiff's claims are typical of the claims of members of the proposed Class because, among other things, Plaintiff and members of the Class sustained similar injuries as a result of Defendant's uniform wrongful conduct and their legal claim arise from the same events and wrongful conduct by Defendant.

150.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the proposed Class.  Plaintiff's interests do not conflict with the interests of Class members and Plaintiff has

retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class.

151.    **Predominance & Superiority.** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy.  The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

152.    **Final Declaratory or Injunctive Relief.** Plaintiff also satisfies the requirements for maintaining a class seeking declaratory and/or injunctive relief.  Defendant has acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

## VII.    TOLLING

### A.    Discovery Rule Tolling

153.    Class members had no way of knowing about Defendant's deceptive practices with respect to the hidden tracking of children via the Temple Run Apps. The invisible, code-based nature of the technology at issue makes clear that Defendant and its Advertising Partners tried to hide (and continue to hide) their conduct from Plaintiff and Class members.

154.    Within the period of any applicable statutes of limitation, Plaintiff and the other Class Members could not have discovered through the exercise of reasonable diligence that Defendant was hiding its true practices.

155.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.    Fraudulent Concealment Tolling**

156.    All applicable statutes of limitation have also been tolled by Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

157.    Instead of disclosing its true practices, Defendant deliberately concealed this information from parents of children who play the Temple Run Apps, including Plaintiff and Class members.

**C.    Estoppel**

158.    Defendant was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of its Temple Run Apps, particularly with regard to the tracking and profiling of children that occurs during game play.

159.    Defendant knowingly, affirmatively, and actively concealed true facts from parents, including Plaintiff and Class members.

160.    Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

**VIII.   CLAIMS FOR RELIEF**

**COUNT I**
**Intrusion Upon Seclusion**

161.    Plaintiff repeats and realleges all preceding paragraphs contained herein.

162.    Arkansas law on intrusion upon seclusion is applicable for all members of the Intrusion Upon Seclusion Class because the Class members reside in Arkansas. The jurisprudence in Arkansas adheres to Restatement (Second) of Torts, § 652B with no material variation.

163.    "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts, § 652B.

164.     Plaintiff Jessica Baker, and her children, KCC, BAB, and LAB and Class members have reasonable expectations of privacy in their mobile devices and their online behavior, generally. Plaintiff's and Class members' private affairs include their behavior on their mobile devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendant.

165.     The reasonableness of such expectations of privacy is supported by Defendant's unique position to monitor Plaintiff's and Class members' behavior through their access to Plaintiff's and Class members' private mobile devices. It is further supported by the surreptitious, highly technical, and non-intuitive nature of Defendant's tracking.

166.     Defendant intentionally intruded on and into Plaintiff's and Class members' solitude, seclusion, or private affairs by intentionally designing the Temple Run Apps to surreptitiously obtain, improperly gain knowledge of, review, and/or retain Plaintiff's and Class members' activities through the monitoring technologies and activities described herein.

167.     These intrusions are highly offensive to a reasonable person. This is evidenced by, *inter alia*, countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations. Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiff's and Class members' Personal Data with potentially countless third parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity. Also supporting the highly offensive nature of Defendant's conduct is the fact that Defendant's principal goal was to surreptitiously monitor Plaintiff and Class members—in one of the most private spaces available to an individual in modern life—and to allow third parties to do the same.

168.     Defendant's intrusion into the sacrosanct relationship between parent and child and subsequent commercial exploitation of children's special vulnerabilities online also contributes to the highly offensive nature of Defendant's activities.

169. Plaintiff and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

170. Defendant's actions and conduct complained of herein was a substantial factor in causing the harm suffered by Plaintiff and Class members.

171. As a result of Defendant's actions, Plaintiff and Class members seek injunctive relief, in the form of Defendant's cessation of tracking practices in violation of state law, and destruction of all Personal Data obtained in violation of state law.

172. As a result of Defendant's actions, Plaintiff and Class members seek declaratory and/or injunctive relief, as well as nominal damages in an amount to be determined at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a.    Certify this case as a class action, appoint Plaintiff as Class representative, and appoint Plaintiff's counsel to represent the Class;

b.    Find that Defendant's actions, as described herein, constitute breaches of the common law claim of intrusion upon seclusion under the law of the State of Arkansas;

c.    Award Plaintiff and each Class member appropriate relief, including nominal damages;

d.    Award equitable, injunctive, and declaratory relief as may be appropriate;

e.    Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

f.    Grant such other legal and equitable relief as the Court may deem appropriate.

Dated: April 26, 2022          Respectfully Submitted,

*/s/ David Slade*

David Slade (ABN 2013143)
slade@wh.law
Brandon Haubert (ABN 2013137)
brandon@wh.law
wh LAW
1 Riverfront Place, Suite 745
Tel: (501) 891-6000
Fax: (501) 222-3027

Allen Carney (ABN 94122)
acarney@cbplaw.com
Hank Bates (ABN 98063)
hbates@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Tel: (501) 312-8500
Fax: (501) 312-8505

*Attorneys for Plaintiff and the proposed Classes*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demand a trial by jury of all issues so triable.

Dated: April 26, 2022                          Respectfully Submitted,

*/s/ David Slade*

David Slade (ABN 2013143)
slade@wh.law
Brandon Haubert (ABN 2013137)
brandon@wh.law
wh LAW
1 Riverfront Place, Suite 745
Tel: (501) 891-6000
Fax: (501) 222-3027

Allen Carney (ABN 94122)
acarney@cbplaw.com
Hank Bates (ABN 98063)
hbates@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Tel: (501) 312-8500
Fax: (501) 312-8505

*Attorneys for Plaintiff and the Proposed Classes*